# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALTA BATES SUMMIT MEDICAL CENTER,<br>350 Hawthorne Avenue<br>Oakland, CA 94609,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL O. LEAVITT, in his official capacity<br>as Secretary, United States Department of Health<br>and Human Services,<br>Department of Health & Human Services<br>200 Independence Avenue, SW<br>Washington, D.C. 20201,<br><br>Defendant. | Civil Action No. _____ |

## COMPLAINT

NOW COMES Plaintiff Alta Bates Summit Medical Center ("Summit") and for its complaint against Michael O. Leavitt, Secretary of Health and Human Services ("Defendant" or "Secretary") alleges as follows:

### NATURE OF THE CASE

1.    This is an action for judicial review of a final decision of the Secretary of the United States Department of Health and Human Services ("HHS") regarding the proper base year to be used in computing limits on Medicare reimbursement for a newly-established inpatient psychiatric unit at Summit Medical Center.[1]

2.    The administrative decision by the Secretary was rendered by the Provider Reimbursement Review Board ("PRRB" or "Board") on April 15, 2008.  See Exhibit A.  The PRRB is a five-person board within HHS that decides Medicare reimbursement disputes between

---

[1] At the times relevant to this lawsuit, the hospital (Medicare Provider No. 05-0043) was known as Summit Medical Center.  Following a merger in 1999, the corporation that owns and operates the hospital is now known as Alta Bates Summit Medical Center.  Because the administrative record in this case refers to the hospital as Summit Medical Center or "Summit," that name will be used in this Complaint.

hospitals and the Medicare program.  The decisions of that Board are reviewable by the Administrator of the Centers for Medicare and Medicaid Services ("CMS").[2]    42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1875.

3.      In this case, the Administrator declined to review the decision of the PRRB.  <u>See</u> Exhibit B.  Thus, the PRRB's decision is the final decision of the Secretary, and is reviewable in federal court.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1871(b); 42 C.F.R. § 405.1877(a).

4.      The PRRB decision at issue in this case is PRRB Dec. No. 2008-D24.  It involved two consolidated appeals, PRRB Case Nos. 01-0679 and 02-0244, for Summit's Medicare cost reporting years ending February 28, 1998, and February 28, 1999.

5.      The inpatient geriatric psychiatric unit at Summit was opened in 1997.  Summit applied for and received approval from the California Department of Health Services to provide this service, and Summit's hospital license was amended to include 17 psychiatric inpatient beds.

6.      Summit also applied for Medicare certification for the new unit as an "excluded" unit under Medicare, which means that it would be excluded from the Medicare prospective payment system ("PPS") and instead be reimbursed on a "reasonable cost" basis.  Medicare certification was granted effective March 1, 1997.

7.      The costs to be reimbursed by Medicare for excluded psychiatric units were subject to a rate of increase limit under the Tax Equity and Fiscal Responsibility Act of 1982, popularly known as "TEFRA."  Under TEFRA, there is a base year to which no cost limits are applied.  The base year for "a newly established excluded unit is the first cost reporting period of at least 12 months following the unit's certification to participate in the Medicare program." 42 C.F.R. § 413.40 (b)(1)(ii).  The base year costs are used to establish an annual ceiling on the rate of increase for succeeding cost years <u>See</u> ¶¶ 21-23, below.  If the psychiatric unit's

---

[2]     CMS was formerly known as the Health Care Financing Administration, or HCFA, and is sometimes  referred to as HCFA in the administrative record in this case.

reasonable costs exceed the TEFRA target amount, Medicare reimbursement is limited to the target amount.

8.     Thus, the TEFRA base year for the geriatric psychiatric unit that was certified effective March 1, 1997, should have been Summit's cost year ending February 28, 1998.

9.     However, five years before the opening of the geriatric psychiatric unit in 1997, Summit had purchased most of the assets of an unrelated entity known as Providence Hospital, including the hospital operations.  That purchase, which was effective March 1, 1992, included an existing adult (not geriatric) psychiatric unit at Providence.  The existing adult psychiatric unit at the old Providence Hospital was closed by Summit as soon as feasible after the asset purchase, ceasing operations in May of  1992.  Thereafter, until 1997, Summit did not have a Medicare certified, excluded psychiatric unit.

10.     The Decision by the Board held that the TEFRA target rate to be applied to Summit's newly-established geriatric psychiatric unit that opened in 1997 should be based on the TEFRA base year for the old, closed Providence Hospital adult psychiatric unit (that is, Providence Hospital's 1984 cost year).  By applying this target rate from a different unit, which had not existed for five years, which provided fundamentally different services, and which reflected costs of operation in 1984 rather than in 1997, the Board's decision results in serious underreimbursement to Summit for its new geriatric psychiatric unit during the 1998 and 1999 cost years.

11.     For the reasons described below, the Board's Decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, unsupported by substantial evidence, and must be held unlawful and set aside pursuant to 5 U.S.C. § 706.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction over this action pursuant to 42 U.S.C. § 1395oo(f)(1).
The Court further has jurisdiction under 28 U.S.C. § 1331.  Plaintiff also is entitled to relief in
this matter pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq.,
including without limitation 5 U.S.C. §§ 704 and 706; and the Declaratory Judgment Act,
28 U.S.C. §§ 2201, 2202.

13.     Venue in this district is proper under 42 U.S.C. § 1395oo(f)(1).

## PARTIES

14.     Plaintiff Alta Bates Summit Medical Center is a California not-for-profit
corporation.  The hospital (Medicare Provider No. 05-0043), which at the times pertinent to this
Complaint was known as Summit Medical Center, is an acute care hospital and Medicare
provider of services located in Oakland, California.

15.     Defendant Michael O. Leavitt is named herein in his official capacity as the
Secretary of the HHS, an agency of the United States Government.  CMS is the operating
component of HHS that administers the Medicare program.

## REGULATORY FRAMEWORK

### Medicare Act

16.     The Medicare program is a federal health insurance program established by Title
XVIII of the Social Security Act (the "Act"), 42 U.S.C. §§ 1395 – 1395hhh.  Among other
things, Medicare provides payment to "providers" of services, such as hospitals, for medical care
services, equipment, and supplies furnished to aged and disabled persons.

17.     The Secretary enters into agreements with organizations known as "fiscal
intermediaries," under which the fiscal intermediaries administer Medicare payment and perform
other Medicare program functions for providers on a regional or national basis.  The fiscal

intermediary assigned to Summit was National Government Services ("Intermediary" or "FI").[3] Fiscal intermediaries determine payment amounts due to providers under Medicare law and under interpretive guidelines published by CMS.    See  42 U.S.C.  § 1395h;  42 C.F.R. §§ 413.20(b).

18.    At the close of its fiscal year, a provider must submit a cost report to the fiscal intermediary showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare.  42 C.F.R. § 413.20.  The fiscal intermediary reviews the cost report, determines the total amount of Medicare reimbursement due the provider, and issues the provider a Notice of Program Reimbursement ("NPR").  42 C.F.R. § 405.1803.  A provider dissatisfied with the intermediary's final determination of total reimbursement may file an appeal with the PRRB within 180 days of the issuance of the NPR.   42 U.S.C.  § 1395oo(a);  42 C.F.R § 405.1841.

19.    From the Medicare program's inception in 1966 until 1983, hospitals were reimbursed the lower of their reasonable costs or customary charges for services provided to Medicare beneficiaries.  The statute at 42 U.S.C. § 1395x(v)(1)(A) defines reasonable costs as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services . . . ."

20.    In 1983, Congress enacted the Social Security Amendments, P.L. No. 98-21, which created the Prospective Payment System ("PPS") for hospital inpatient operating costs. 42 U.S.C. § 1395ww(d).  Psychiatric hospitals and units that were certified by Medicare to be "excluded" from PPS continued to receive reasonable cost reimbursement.

---

[3] Blue Cross and Blue Shield Association represents certain fiscal intermediaries in proceedings before the PRRB, and did so in this case.

**TEFRA Limits**

21.    In 1982, Congress enacted the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub. L. No. 97-248, 96 Stat. 324 (1982).  TEFRA imposes a ceiling on the rate of increase of the inpatient operating costs that will be reimbursed by Medicare.  See 42 C.F.R. § 413.40.  During the years relevant to this appeal, TEFRA limits applied to hospital-based psychiatric units that were excluded from hospital inpatient PPS.  The ceiling is specific to the particular excluded unit.  A target amount per discharge is derived from the unit's allowable net Medicare inpatient operating costs in the base year.  The target amount for subsequent years is updated by an annual update factor.  The TEFRA ceiling for a particular cost year is calculated by multiplying the updated target amount by the number of Medicare discharges within that period.  See 42 C.F.R. § 413.40(a)(3) (defining "target amount" and "ceiling").

22.    If a provider incurs costs below the applicable TEFRA target amount in a given cost reporting year, it is entitled to reimbursement for its reasonable costs plus an additional incentive payment.  Because the TEFRA target amount serves as a ceiling, a provider may generally not be reimbursed for its costs above its TEFRA target amount for a particular year.

23.    42 C.F.R. § 413.40(b)(1)(ii) sets forth the method for determining the TEFRA base year for a newly established unit, stating:

> (ii) The base period for a newly established excluded unit is the first cost reporting period of at least 12 months following the unit's certification to participate in the Medicare program.

**FACTS**

24.    In 1997, Summit opened a new geriatric inpatient psychiatric unit.  As a "geri-psych" unit, this unit would only provide services to patients 65 years of age or older, unless the patient had a disability recognized by Medicare, in which case the patient had to be at least 55 years of age.  It applied for and received approval from the California Department of Health

Services to provide this service, and Summit's hospital license was amended to include 17 psychiatric inpatient beds.  Under California law, a hospital cannot provide inpatient psychiatric services unless it is specifically licensed to do so.

25.    Summit also applied for Medicare certification for the new PPS-excluded unit, which was granted effective March 1, 1997.

26.    When it filed its FYE 2/28/98 Medicare cost report, Summit reflected the 17 bed inpatient geriatric psych unit as a subprovider on its cost report, with a certification date of March 1, 1997.  The geri-psych unit was reported on the as-filed cost report as a new excluded unit subject to cost-based reimbursement with no TEFRA target rate limit applied.

27.    During audit by the Medicare fiscal intermediary of the FY 1998 cost year, the senior auditor and her supervisor agreed that the base year for TEFRA purposes for this newly-certified unit was the FYE 1998 cost year.  The workpapers prepared by the senior auditor on April 21, 1999, showed FYE 1998 as the TEFRA base year, with a cost per discharge of $16,110.18.  Because the auditors viewed FYE 1998 as the proper base year for this newly certified unit, no TEFRA target amount was applied in that year in those workpapers.  The hospital's interim rate paid after the new unit opened was also based on use of FYE 1998 costs as the TEFRA base year.

28.    In the year 2000, the field auditors were overruled, and the FI decided that a TEFRA limit should be applied.  The TEFRA rate that the FI ultimately  applied was based on the 1984 cost year for a different adult psychiatric unit that had been operated by Providence Hospital, an unrelated entity, prior to the formation of Summit Medical Center.

29.    As part of a larger transaction, Summit purchased most of the assets of Providence Hospital in 1992.  The purchase included the hospital operations of Providence, and consequently included the existing adult psychiatric unit at Providence.  The transaction was

effective March 1, 1992.  The psychiatric unit at the old Providence Hospital was closed by Summit as soon as feasible after the asset purchase.  After May 1992, the census reports show no patients in that unit.

30.    After closure in 1992, Summit requested that the State of California remove psychiatric services entirely from its hospital license.  On November 9, 1992, the California Department of Health Services Licensing and Certification division formally removed psychiatric services from Summit's license.  From 1992 to 1997 Summit was legally prohibited from offering psychiatry as a special service until that service was applied for, approved, and Summit's license amended by the state.

31.    Summit did not offer or provide inpatient psychiatric services for almost five years (from May 1992 to February 1997).  Its hospital licenses for years prior to 1997 demonstrate that there were no licensed psychiatric beds and psychiatry was not listed as a service.

32.    The Medicare cost reports after FYE 1993, but before the establishment of the new geri-psych unit during the 1998 cost year, show that Summit did not have a Medicare certified psychiatric unit during that time period.

33.    On the audited Medicare cost report for FYE 1998, the Intermediary showed the date of Medicare certification of the new unit as March 1, 1997.

34.    However, in applying a TEFRA limit on the audited cost report, the Intermediary took the old Providence unit's 12/31/84 base year cost of $4,555.42 per discharge, updated it, and applied it to the newly-certified geriatric unit for Summit's 2/28/98 cost year.  The resulting, updated per discharge target amount applied by the Intermediary was $7,434.31.  The actual cost per Medicare discharge at the Summit geriatric psych unit was $16,108.41 for the 1998 cost year.

35.    The application of the $7,434.31 TEFRA target amount derived from the old Providence unit's costs in 1984 resulted in limiting the reimbursement per discharge to $8,177.74, after adjustments.    Multiplying the difference between these $16,108.41 and $8,177.74 figures by the number of discharges results in a reduction of reimbursement of $721,691.

36.    A similar approach was taken by the FI for the 1999 cost year.    In that year, an audit adjustment was made to apply a TEFRA target amount per discharge of $7,434.31.    The actual cost per discharge in 1999 was $13,277.92, but in the Provider's 2/28/99 cost year that cost was capped by a national 75th percentile limit of $10,534.    Again, reimbursement was significantly reduced by using the target amount of $7,434.31 derived from the old Providence unit, reducing reimbursement to Summit by $422,798.

37.    Uncontradicted, sworn testimony and exhibits entered into the record at the hearing established that costs are substantially different for a geriatric psych facility than for an ordinary adult unit.    Because patients in a geriatric psych facility are older, as a group they have different medical and psychiatric problems, and far more medical co-morbidities, than do ordinary adult psychiatric patients.    Their medical problems are often chronic, and significantly greater resources are generally required to treat geriatric psych patients.    Unlike patients in ordinary adult facilities, who apart from episodic hospitalizations generally live unassisted in the community, geriatric patients are frequently not capable of self-care, and may spend much of their time in institutional settings.

38.    Testimony indicated that about 50% of the patients at Summit required "total care"; that is, they may have been bed bound; non-ambulatory or had serious difficulties with ambulation; were incontinent of bowel and/or bladder, or required regular assistance with toileting; required assistance with dressing and/or bathing and feeding; had generalized weakness

or impairments of balance; had varying degrees of dementia; or because of some combination of the above were unable to care for themselves in normal activities of daily living. These conditions require substantially greater levels of staffing than are required in an ordinary adult psychiatric facility or unit. Patients in the Summit Unit often required one-on-one attention and assistance by staff in order to accomplish the fundamental tasks of feeding, toileting, moving about, dressing, brushing their teeth, and bathing. For patients who were ambulatory (with or without assistance), there was frequently a much greater risk for falls, which also leads to more intensive supervision by staff, and higher staffing levels. Higher staffing levels in turn translate to higher costs in caring for geriatric patients than is the case in a typical adult facility, where the patients can generally dress themselves, eat, move about, and toilet without assistance.

39. In addition, the chronic medical problems frequently afflicting elderly patients require more staffing by higher level professionals, such as RNs. At Summit, the staffing ratio was one R.N. to every six patients. This is principally due to the greater medical acuity of geriatric patients. Patients at Summit received a full nursing assessment at each shift, in order to appropriately monitor and manage each patient's medical condition. This frequent medical nursing assessment and monitoring is not done routinely in ordinary adult psych facilities, because most often the patient is admitted only for psychiatric problems. Most of the routine daily care in an ordinary adult facility can be performed by mental health workers whose training and education is substantially less than that of registered nurses, and whose salary costs are accordingly less.

40. The medical conditions presented by geriatric psych patients also require more frequent lab tests, more medications with closer monitoring of those medications, and more expensive physical plant and equipment than is usually seen in an adult unit.

41.    Record evidence also showed that patients at the Summit geri-psych unit often required specialized diagnostic tests, such as nuclear medicine, MRIs and CT-scans, for their medical conditions.  Because the patients would have to travel to receive these diagnostic tests, the staff would be required to accompany the patients (leading to increased staffing ratios).  There were occupational therapists and physical therapists at the Summit unit, which were not generally needed at the old Providence unit.  Additional equipment, such as specialized beds, were used in the geriatric psych unit that were not available in the Providence unit.

42.    The policies and procedures in place for the Summit geriatric psychiatric unit, which were introduced into evidence at the PRRB hearing, also demonstrate the higher levels of care provided for this elderly patient population.  For example, the Departmental Scope of Services recognizes that the care furnished at the unit goes beyond traditional psychiatric care and encompasses medical treatment for the patients as well.

43.    The policies demonstrate the significant number of clinicians and nursing staff involved with these geriatric patients, providing for assessments by an admitting nurse, a physician, a psychiatrist, a social worker, occupational therapist, recreational therapist, activity therapist, nutritionist (or designees), psychologist, and various consultants, within three days of admission.  The policies specifically requires a physical illness diagnosis on the part of the physician in addition to a psychiatric diagnosis. The policies also provide for assessments by vision, hearing and speech specialists, which would be expected more for an older population than in an ordinary psych facility.

44.    Not only do the policies require that every patient be assessed by a registered nurse at the beginning of every shift, they also provide that nursing rounds are made every thirty minutes, which requires a high degree of staffing.

45.     These higher costs and higher staffing levels at the new unit, particularly by RNs, are borne out by the data submitted by Summit, based on official state reports.  That data, introduced at the hearing, showed that the direct expense per patient day was $325.33 at the old adult unit in 1993, and $903.39 at the new, geriatric unit in 1998, a nearly three-fold increase. Salaries per day were almost twice as high, and professional fees were substantially higher as well, to reflect nursing registry (contract) personnel.

46.     A substantial part of the cost difference is due to more intensive staffing levels at the geriatric psych unit, and staffing by nurses rather than by less highly trained, less expensive personnel.  In 1993, at the previous unit, the hours per patient day for registered nurses were 3.81.  In 1998, at the geriatric unit there were 10.65 hours per patient day for registered nurses, a nearly threefold increase.  Licensed vocational nurse staffing was also different at the two units. In 1993, at the old unit, LVN staffing was .51 hours per patient day, whereas at the new unit in 1998 it was 1.57 - more than three times as much.  Technician and specialist staffing was about five times higher at the new unit, and staffing by lower cost aides and orderlies was less in the new unit.  In total, the number of staff hours per patient day was 6.17 at the old adult unit in 1993.  At the new geriatric unit, total staff hours per patient day were 16.80.

## PROCEDURAL HISTORY

47.     The FYE 1998 and FYE 1999 NPRs and audited cost reports were timely appealed to the PRRB, and assigned PRRB Case Nos. 01-0679 and 02-0244, respectively.  The two appeals were consolidated for hearing and decision, and an evidentiary hearing was held before two members of the Board on July 17, 2007.  Both parties submitted position papers. Live testimony, sworn declarations, and documentary exhibits were received into the administrative record.  Summit submitted 24 exhibits and one revised exhibit into evidence.  It called one witness, Ms. Judy Bain of Toyon Associates, Inc., a consulting group, and submitted

two sworn declarations. The fiscal intermediary submitted one exhibit and called no witnesses. Summit submitted a post-hearing brief, with additional documentation.

48. On April 15, 2008, the Board rendered its Decision in the case (PRRB Dec. No. 2008-D24), attached hereto as Exhibit A, and incorporated in this Complaint by reference as if set out at length herein. The Decision was received by Summit's representative on April 17, 2008.

49. The Board found that the facts in the case were undisputed. Decision at 6. Rather than applying the straightforward language of 42 C.F.R. § 413.40(b)(1)(ii), which provides that the TEFRA "base period for a newly established excluded unit is the first cost reporting period of at least 12 months following the unit's certification," the Board instead relied on inapplicable language from another part of that regulation. It applied the provisions of 42 C.F.R. § 413.40(b)(1)(i), which states that the target rate remains applicable to an excluded unit that during intervening cost reporting periods "is not subject to the ceiling as the result of other provisions of the law or regulations, or nonparticipation in the Medicare program . . . ."

50. The Board found that following the regulation relied on by Summit, which plainly states that the base period is the first cost reporting period following the unit's certification, would have "adverse policy implications." Decision at 6. According to the Board, "Any provider unhappy with its base year rate could simply close and reopen." Id. There was no evidence of record indicating that Summit or any other provider had ever attempted such a maneuver. In fact, even according to the Board, in the case before it "an extended period of time" had elapsed, and "there is no evidence of intent to manipulate the base year rate."

51. The Board further found that "42 C.F.R. § 413.40(b)(1)(ii) applies only to hospital units that have never had a target amount established (and that do not qualify under 42 C.F.R. § 413.40(f))." The Board cited no authority for this finding. Furthermore, it was undisputed that

Summit had not sought a new provider exemption under § 413.40(f), so this part of the Board's holding does not limit the application of 42 C.F.R. § 413.40(b)(1)(ii) in the case at bar.

52.    Finally, the Board purported to disagree with Summit that the "the unit was new in that it served only geriatric patients who had far more severe medical conditions and therefore more cost."  Decision at 6.    It stated that because there is no distinction in certification for a geri-psych unit, these different costs were "irrelevant."  Id.  However, Summit did not rely on a distinction in Medicare certification to support its contention that the language of § 413.40(b)(1)(ii) should apply.    Instead, evidence of the differences in patient population, services, equipment, staffing, and other costs was submitted by Summit in order to demonstrate the inappropriateness of basing a TEFRA rate for the geri-psych unit on the costs of a different unit that had ceased to exist five years previously.

53.    On May 1, 2008, Summit timely requested review by the CMS Administrator of the Board's Decision.

54.    On June 10, 2008, Summit's representative received notice from the CMS Office of Attorney Advisor that the Administrator had declined to review the Board's Decision.  See Exhibit B.

55.    Consequently, the PRRB's Decision constitutes the final decision of the Secretary with regard to these two appeals, and is reviewable by this Court in accordance with 42 U.S.C. § 1395oo(f) and 42 C.F.R. § 405.1877.

## COUNT I

**(Agency Action That Is Arbitrary, Capricious, Contrary to Law, and Unsupported by Substantial Evidence Under 5 U.S.C. § 706)**

56.    The allegations contained in paragraphs 1-55 are realleged and incorporated by reference herein.

57.    The Board's Decision is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law; is unsupported by substantial evidence in the record considered as a whole; and must held unlawful and set aside pursuant to 5 U.S.C. § 706.  The reasons why the Decision must be held unlawful and set aside include, but are not limited to, the following:

58.    The Board failed to apply the regulation that determines the TEFRA base year for Summit's geri-psych unit established in 1997.  42 C.F.R. § 413.40(b)(1)(ii) states that the base year will be the first cost reporting period following certification of the unit.  This unit was certified effective March 1, 1997.  Thus, the cost reporting period ending February 28, 1998, is the TEFRA base year required by regulation, but the Decision employed a base year of 1984, based on the costs of a unit established at another hospital.

59.    Instead of employing the proper regulation, the Board relied on inapplicable regulation, 42 C.F.R. § 413.40(b)(1)(i), which applies to existing units that for specified reasons are temporarily not subject to the TEFRA ceiling, not to newly-certified units.

60.    The Board based its decision on an unsupported speculation that providers might possibly close and reopen excluded psychiatric units to achieve a better base year rate.  However, there was no evidence in the record that Summit had done so, and in fact the evidence was clear that it had not done so.  Furthermore, there was no evidence of record that providers in general would attempt such action, or that such an attempt could not be adequately handled if some provider were to engage in a sham transaction.

61.    The Board disregarded extensive, uncontradicted evidence of record that the new geri-psych unit was different in staffing, cost structure, equipment, patient population, and other characteristics that made application of a 1984 base year from an ordinary adult unit wholly inappropriate for this new unit which serviced patients of higher medical acuity.

62.    The Board improperly limited the application of 42 C.F.R. § 413.40(b)(i)(ii) to hospital units that have never had a target amount established (and that do not quality under 42 C.F.R. § 413.40(f)), without citation of authority or any reasoned explanation to justify that conclusion.

63.    The Board's Decision erroneously treated the new geri-psych unit as somehow being a continuation of the former Providence Hospital unit, referring to them both as "the unit," and stating that "the unit" was closed during intervening cost report periods, when in fact there was no unit at all during the period June 1992 though February 1997, and Summit was legally precluded from having one.

64.    The Board's Decision does not state why the plain language of 42 C.F.R. § 413.40(b)(1)(ii), which establishes the date of Medicare certification as determining the base year, does not apply.

**PRAYER FOR RELIEF**

WHEREFORE, Summit respectfully requests that the Court enter an Order and Judgment:

1.    Finding and declaring that the Secretary's final decision applying the TEFRA target amount derived from Providence Hospital's 1984 base year to Summit's 1998 and 1999 cost years is arbitrary, capricious, an abuse of discretion, and not in accordance with law; is unsupported by substantial evidence; and is unlawful and must be set aside;

2.    Finding and declaring that the TEFRA base year for Summit's geriatric psychiatric unit that was certified by Medicare on March 1, 1997, is its cost year ending on February 28, 1998, in accordance with the plain language of 42 C.F.R. § 413.40(b)(1)(ii);

3.    Finding and declaring that the Secretary's final decision applying 42 C.F.R. § 413.40(b)(1)(i) is not in accordance with law, and is unsupported by the evidence in this case;

4.      Ordering the Defendant Secretary to employ Summit's cost year ending February 28, 1998, as the TEFRA base year for its geriatric psychiatric unit, and to reimburse Summit for its 1998 and 1999 cost years in accordance with the use of that 1998 cost year as the TEFRA base year;

5.      Making such other findings and declarations as are necessary to support such Order and Judgment;

6.      Awarding Summit its costs and reasonable attorneys' fees;

7.      Awarding Summit interest in accordance with 42 U.S.C. § 1395oo(f)(2) and 42 C.F.R. § 413.64(j); and

8.      Awarding such other relief as may be warranted at law or in equity.

Respectfully submitted,


By:_____/s/ Dan M. Peterson_____
        Dan M. Peterson
        D.C. Bar No. 418360
        Fulbright & Jaworski L.L.P.
        801 Pennsylvania Avenue N.W.
        Washington, D.C. 20004
        Telephone:  (202) 662-0200
Dated:      June 13, 2008          Facsimile:  (202) 662-4643
        Attorneys for Plaintiff

# EXHIBIT A



# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## PROVIDER REIMBURSEMENT REVIEW BOARD
### 2520 Lord Baltimore Drive, Suite L
### Baltimore MD 21244-2670
**Phone: 410-786-2671**                    **FAX: 410-786-5298**
**Internet: www.cms.hhs.gov/PRRBReview**

Suzanne Cochran, Esq., Chairperson
Elaine Crews Powell, CPA
Yvette C. Hayes
Michael D. Richards, CPA

Refer to: Case Nos.:  01-0679 and 02-0244
Decision No.:  2008-D24

APR 1 5 2008

## CERTIFIED MAIL

Mr. Dan M. Peterson, Esquire
Fulbright & Jaworski, LLP
801 Pennsylvania Avenue, NW
Washington, DC  20004-2623

RE:  Summit Medical Center
     Provider No.:  05-0043
     FYEs - 02/28/1998 and 02/28/1999

Dear Mr. Peterson:

A copy of the Provider Reimbursement Review Board's decision on the above-referenced appeal is enclosed.  Please see enclosure for review and appeal information.

If you have any questions, please call (410) 786-2671.

Sincerely,

Paul J. Crofton, Director
Division of Hearings and Decisions

5 Enclosures
    Final Decision Review and Appeal Information
    Decision
    42 USC 1395oo(f)
    42 CFR 405.1875 and 405.1877

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

## 2008-D24

**PROVIDER –**
Summit Medical Center
Oakland, California

Provider No.: 05-0043

**vs.**

**INTERMEDIARY –**
BlueCross BlueShield Association/
National Government Services, LLC - CA

**DATE OF HEARING –**
July 17, 2007

Cost Reporting Periods Ended –
February 28, 1998 and February 28, 1999

**CASE NOs.:** 01-0679 and 02-0244

## INDEX

|  | Page No. |
|---|---|
| Issue | 2 |
| Medicare Statutory and Regulatory Background | 2 |
| Statement of the Case and Procedural History | 3 |
| Intermediary's Contentions | 5 |
| Provider's Contentions | 5 |
| Findings of Fact, Conclusions of Law and Discussion | 6 |
| Decision and Order | 7 |

CNs: 01-0679 and 02-0244

ISSUE:

Whether the TEFRA base year used by the fiscal intermediary to compute a target
amount for the Provider's excluded psychiatric unit for the February 28, 1998 and
February 28, 1999 cost years was proper.

MEDICARE STATUTORY AND REGULATORY BACKGROUND:

This is a dispute over the amount of Medicare reimbursement due a provider of medical
services, and the TEFRA base year used to establish that amount.

The Medicare program was established to provide health insurance to the aged and
disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare and Medicaid Services
(CMS), formerly the Health Care Financing Administration (HCFA), is the operating
component of the Department of Health and Human Services (DHHS) charged with
administering the Medicare program. CMS' payment and audit functions under the
Medicare program are contracted out to insurance companies known as fiscal
intermediaries. Fiscal intermediaries determine payment amounts due the providers
under Medicare law and under interpretive guidelines published by CMS. See, 42 U.S.C.
§1395h, 42 C.F.R. §§413.20(b) and 413.24(b).

At the close of its fiscal year, a provider must submit a cost report to the fiscal
intermediary showing the costs it incurred during the fiscal year and the portion of those
costs to be allocated to Medicare. 42 C.F.R. §413.20. The fiscal intermediary reviews
the cost report, determines the total amount of Medicare reimbursement due the provider
and issues the provider a Notice of Program Reimbursement (NPR). 42 C.F.R.
§405.1803. A provider dissatisfied with the intermediary's final determination of total
reimbursement may file an appeal with the Provider Reimbursement Review Board
(Board) within 180 days of the issuance of the NPR. 42 U.S.C. §1395oo(a); 42 C.F.R.
§405.1835.

From the Medicare program's inception in 1966 until 1983, hospitals were reimbursed
the lower of their reasonable costs or customary charges for services provided to
Medicare beneficiaries. The statute at 42 U.S.C. §1395x(v)(1)(A) defines reasonable
costs as "the cost actually incurred, excluding therefrom any part of incurred cost found
to be unnecessary in the efficient delivery of needed health services. . . ." Congress
ultimately amended the reasonable cost payment system because it was concerned that
while being reimbursed the reasonable costs of covered services, providers had no
incentive to provide services efficiently or otherwise limit their costs. Congress first
modified the law by enacting 42 U.S.C. §1395ww(a), which established limits on the
operating costs of inpatient hospital services and authorized the Secretary of the
Department of Health and Human Services (Secretary) to promulgate regulations to
establish prospective limits on the costs recognized as reasonable in furnishing patient
care.

In 1982, Congress enacted the Tax Equity and Fiscal Responsibility Act (TEFRA), again modifying the reasonable cost reimbursement methodology in order to create incentives for the providers to render services more efficiently and economically. 42 U.S.C. §1395ww(b). TEFRA imposed a ceiling on the rate-of-increase of inpatient operating costs recoverable by a hospital. The TEFRA ceiling, or target amount, is calculated based upon the allowable Medicare operating costs in a hospital's base year (net of certain other expenses including capital-related and medical education costs) divided by the number of Medicare discharges in that year. The TEFRA target amount is updated annually based on an inflation factor. If a provider incurs costs below the applicable TEFRA target amount in a given cost reporting year, it is entitled to reimbursement for its reasonable cost plus an additional incentive payment.[1] If a provider's cost exceed its target amount, 42 C.F.R. §413.40(d)(3) provides for a relief payment under certain circumstances. The Balanced Budget Act of 1997 (BBA 97)[2] amended TEFRA legislation with respect to existing and new psychiatric hospitals and units, rehabilitation hospitals and units, and long-term acute care hospitals.

During the time period in question for this appeal, TEFRA limits applied to hospital-based psychiatric units that were excluded from the hospital inpatient prospective payment system (IPPS). The TEFRA ceiling is specific to the particular excluded unit. A target amount per discharge is derived from the unit's allowable net Medicare inpatient operating costs in the base year, and updated as noted above. The TEFRA ceiling is calculated by multiplying the updated target amount by the number of Medicare discharges within that period. See, 42 C.F.R. §413.40(a)(3) (defining "target amount" and "ceiling").

STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

This case relates to two appeals by Summit Medical Center (Provider; Summit) for its cost years ended February 28, 1998 (FYE 2/28/98) and February 28, 1999 (FYE 2/28/99). The issue in both appeals concerns the proper base year to be used to compute the TEFRA target amount for the Provider's PPS-excluded geriatric psychiatric unit. All other issues in the two appeals have been resolved through administrative resolutions.

The Provider is a 502-bed, not-for-profit acute care hospital located in Oakland, California. Summit was created in 1992 by the merger of Merritt Peralta Medical Center into Samuel Merritt Hospital. Both were not-for-profit corporations, and Merritt Peralta Medical Center was the sole corporate member of Samuel Merritt Hospital. The surviving corporation was Samuel Merritt Hospital. That corporation was renamed (eventually becoming Summit), and as part of the transaction, it purchased most of the assets of Providence Hospital, another not-for-profit corporation, which included an existing adult psychiatric unit. The transaction creating Summit was effective March 1, 1992. The psychiatric unit at the old Providence

---

[1]   In 1983, Congress enacted the Social Security Amendments, P.L. No. 98-21, which created the Prospective Payment System (PPS) for hospital inpatient operating costs. After the implementation of PPS, only providers and units within providers exempt from PPS that continued to be paid under the reasonable cost system were subject to the TEFRA rate-of-increase limit.

[2]   P.L. 105-33.

Hospital was closed by Summit by June 1992 as evidenced by the census reports showing no patients in that unit.[3]

After closure of the psychiatric unit in 1992, Summit requested that the State of California remove psychiatric services entirely from its hospital license.[4]  On November 9, 1992, the California Department of Health Services Licensing and Certification Division formally removed psychiatric services from Summit's license.[5]

Summit did not offer or provide inpatient psychiatric services for almost five years (from June 1992 to February 1997) and was legally prohibited from offering those services without a special services permit from the State.[6]  The Medicare cost reports after FY 1993, but before the establishment of the geriatric psychiatric (geri-psych) unit, show that Summit did not have a psychiatric subprovider.

In 1997, Summit opened an inpatient geri-psych unit.  It applied for and received approval from the California Department of Health Services to provide this service, and the Provider's hospital license was amended to include 17 psychiatric inpatient beds.  The Provider also applied for Medicare certification for the unit, which was granted effective March 1, 1997.

In filing its FYE 2/28/98 Medicare cost report, the Provider included the 17-bed inpatient geri-psych unit as a subprovider.  On the as-filed cost report, the geri-psych unit was treated as a cost-based reimbursement subprovider with no TEFRA target rate limit applied.

The Intermediary applied a TEFRA limit, by taking the former Providence psychiatric unit's 1984 base year cost of $4,555.42 per discharge, updated it, and applied it to the newly certified geriatric unit for Summit's 2/28/98 cost year.[7]  The resulting updated per-discharge target amount applied by the Intermediary was $7,434.31.[8]  The actual Medicare cost per discharge at the Summit geri-psych unit was $16,108.41 for the 1998 cost year.[9]  The application of the TEFRA target amount derived from the former psychiatric unit's costs in 1984 resulted in limiting the reimbursement per discharge to $8,177.74.[10]  Multiplying the difference between these two figures by the number of discharges results in a reduction in reimbursement of $721,691.[11]

A similar approach was taken by the Intermediary for the FYE 2/28/99 cost year resulting in an updated TEFRA target amount per discharge of $7,434.31.[12]  The Provider's actual cost per

---

[3]  See, Exhibit P-8; Tr. at 58.
[4]  Tr. at 58.
[5]  See, Exhibit P-13; Tr. at 58-59.
[6]  See, Exhibit P-4; Tr. at 60-63.
[7]  See, Exhibit P-9, pp. 14-15; Tr. at 73.
[8]  See, Exhibits P-9 and P-10 (Audit Adjustment Report excerpt, Adjustment 99); Tr. at 73.
[9]  See, Exhibits P-1.
[10]  See, Exhibit P-1, p-1; Tr. at 81.
[11]  See, Exhibit P-1, p.1; Tr. at 82.
[12]  See, Exhibits P-11, P-12; Tr. 78.

discharge in FYE 2/28/99 was $13,277.92. However, its cost was capped by a national 75th percentile limit of $10,534.[13]

The FYE 2/28/98 and FYE 2/28/99 cost reports disputing the Intermediary adjustments were timely appealed to the Board. The Provider was represented by Dan M. Peterson, Esquire, of Fulbright & Jaworski, LLP. The Intermediary was represented by Bernard M. Talbert, Esquire, of Blue Cross Blue Shield Association.

INTERMEDIARY'S CONTENTIONS:

The Intermediary contends that 42 C.F.R. §413.40(b)(1)(i) is applicable to the Provider's factual situation. It states:

> (i) The target amount established under this provision remains
> applicable to a hospital or excluded hospital unit as described in
> §§412.25 through 412.30 of this chapter, despite intervening cost
> reporting reports during which the hospital or excluded hospital unit
> is not subject to the ceiling as a result of other provisions of the law
> or regulations, or nonparticipation in the Medicare program, unless
> the hospital or excluded hospital unit qualifies as a new hospital or
> excluded part hospital unit under the provisions of paragraph (f) of
> this section.

The Intermediary argues that the psychiatric unit had a target amount established for a psychiatric sub-provider and was not subject to a target limit during intervening cost reporting periods (1994-1997) because of its decision not to offer psychiatric services. The Intermediary observes that the regulations do not contemplate the opportunity for an ongoing acute care hospital to get a more favorable TEFRA target rate by closing a unit and reopening it at a later time. 42 C.F.R. §§412.25 and 412.27, the qualifying regulations for a PPS-exempt psychiatric unit, make no distinction between a given unit's choice of what type of patients it will serve. The Intermediary further contends that even under its application of 42 C.F.R. §413.40)(b)(l)(i), the Provider could have nevertheless obtained relief from the target and by applying for a exception to the TEFRA limits under 42 C.F.R. §413.40(e) and (g) but did not. Factors such as increased length of stay, more intense ancillary services, excess overhead and increased wages due to an emphasis on geriatric patients could have been pursued under the exception criteria.

PROVIDER'S CONTENTIONS:

The Provider contends that 42 C.F.R. §413.40(b)(1)(ii) applies. It provides that "[t]he base period for a newly established excluded unit is the first cost reporting period of at least 12-months following the unit's certification to participate in the Medicare program." Since the former psychiatric unit did not exist for nearly five years and had to have its license amended to open in 1997, it was a "newly established excluded unit," and its base year would, therefore, be its first full year of operation following its 1997 certification.

---

[13] See, Exhibits P-1, pp. 1, 11; Tr. at 77-80.

The Provider argues that 42 C.F.R. §413.40(b)(1)(i) is not applicable in this instance because it applies to excluded units that continue in existence, but are temporarily not subject to the TEFRA ceiling. In the Provider's case, the unit ceased to exist. 42 C.F.R. §413.40(f), New Hospitals And Units, used by the Intermediary to deny TEFRA exemption for the Provider's unit, does not apply because it can only apply when 42 C.F.R. §413.40(b)(1)(i) applies, and the Provider did not request a new provider exemption for its geriatric unit.

## FINDINGS OF FACT, CONCLUSION OF LAW AND DISCUSSION:

After considering the Medicare law, regulations, program instructions, evidence presented and parties' contentions, the Board finds and concludes that the Intermediary properly used the inflation-adjusted 1984 base year rate and applied the FY 98 and FY 99 TEFRA limits to the Provider's psychiatric unit. It is undisputed that the Provider does not qualify for the new Provider exemption under 42 C.F.R. §413.40(f). Each party relies on §413.40(b)(1) to support its position.

The facts regarding the Provider's position are detailed in the Statement of the Case and Procedural History above. They are undisputed. The Board finds that these facts fit within the provisions of 42 C.F.R. §413.40(b)(1)(i). The Provider had a target amount established but then had intervening cost reporting periods during which it closed the psychiatric unit. As a result, it ceased participating in the program.

The Board observes that even though the psychiatric unit was closed for an extended period of time, and there is no evidence of intent to manipulate the base year rate, allowing the Provider's interpretation would have adverse policy implications. Any provider unhappy with its base year rate could simply close and reopen.

The Provider argues that the language of 42 C.F.R. §413.40(b)(1)(i) cannot apply because it assumes the Provider's excluded unit must be in existence during the intervening cost reporting periods in which the target amount did not apply. The Board finds that the regulatory language does not support that reading. On the contrary, the Board finds that not being subject to the ceiling or not participating in the Medicare program for the intervening cost reporting periods because the unit was closed, is equally reasonable and better serves the intent of the regulation.

The Board also finds that 42 C.F.R. §413.40(b)(1)(ii) applies only to hospital units that have never had a target amount established (and that do not qualify under 42 C.F.R. §413.40(f)). Therefore, 42 C.F.R. §413.40(b)(1)(ii) is not applicable in this situation. The Board also disagrees with the Provider's position that the unit was new in that it served only geriatric patients who had far more severe medical conditions and therefore more cost. The evidence shows that there is no distinction in certification for a geri-psych unit. The difference in the character of the psychiatric unit is therefore irrelevant. These differences would have been relevant if the Provider had pursued different remedies as the Intermediary suggests. Those issues are not before us.

Page 7                                          CNs: 01-0679 and 02-0244

DECISION AND ORDER:

The Intermediary's use of the inflation-adjusted 1984 base year TEFRA target rate for computing the target rate applicable to the Provider's psychiatric unit for the years in issue was correct. The Intermediary's adjustment are affirmed.

BOARD MEMBERS PARTICIPATING:

Suzanne Cochran, Esquire
Elaine Crews Powell, CPA
Yvette C. Hayes
Michael D. Richards, CPA

FOR THE BOARD:

Suzanne Cochran, Esquire
Chairperson

DATE:  APR 1 5 2008

## Final Decision Review and Appeal Information

The Provider Reimbursement Review Board's (Board) decision becomes final 60 days after the date of receipt by the provider unless within that time the Administrator of HCFA notifies the parties of an action taken under the provisions of 42 C.F.R. § 405.1875. If such action is taken, then the Administrator's decision becomes final 60 days after receipt thereof by the provider.

Providers are permitted to initiate two actions within specified time limits. First, the provider (and/or the intermediary) may request the Administrator to review a Board decision within 15 days of its receipt. (See § 405.1875(b)). Secondly, Section 1878(f) of the Social Security Act ("Act"), 42 U.S.C. § 1395oo(f), permits a provider to obtain judicial review of a final decision of either the Board or the Administrator by filing a civil action within 60 days of the date on which the provider receives such decision. (See also 42 C.F.R. § 405.1877). For your convenience, a copy of each of the above-referenced authorities is enclosed.

Enclosures

## § 405.1875  Administrator's review.

(a) *General rule.* (1) Except for a Board determination under § 405.1842 that it lacks the authority to decide an issue, the Administrator, at his or her discretion, may review any final decision of the Board, including a decision under § 405.1873 about the Board's jurisdiction to grant a hearing. The Administrator may exercise this discretion on his or her own motion, in response to a request from a party to a Board hearing or in response to a request from HCFA.

(2) The Office of the Attorney Advisory will examine the Board's decisions, the requests made by a party or HCFA and any submission made in accordance with the provisions of this section in order to assist the Administrator in deciding whether to exercise this review authority.

(b) *Request for review.* A party or HCFA requesting the Administrator to review a Board decision must file a written request with the Administrator within 15 days of the receipt of the Board decision.

(c) *Criteria for deciding whether to review.* In deciding whether to review a Board decision, either on his or her own motion or in response to a request from a party to the hearing or HCFA, the Administrator will normally consider whether it appears that:

(1) The Board made an erroneous interpretation of law, regulation or HCFA Ruling;

(2) The Board's decision is not supported by substantial evidence; or

(3) The case presents a significant policy issue having a basis in law and regulations, and review is likely to lead to the issuance of a HCFA Ruling or other directive needed to clarify a statutory or regulatory provision;

(4) The Board has incorrectly assumed or denied jurisdiction or extended its authority to a degree not provided for by statute, regulation or HCFA Ruling; and

(5) The decision of the Board requires clarification, amplification, or an alternative legal basis for the decision.

(d) *Decision to review.* (1) Whether or not a party or HCFA has requested review, the Administrator will promptly notify the parties and HCFA whether he or she has decided to review a decision of the Board and, if so, will indicate the particular issues he or she will consider.

(2) The Administrator may decline to review a case or any issue in a case even if a party has filed a written request for review under paragraph (b) of this section.

(e) *Written submissions.* (1) Within 15 days of receipt of a notice that the Administrator has decided to review a Board decision, a party or HCFA may submit to the Administrator, in writing:

(i) Proposed findings and conclusions;

(ii) Supporting views or exceptions to the Board decision;

(iii) Supporting reasons for the exceptions and proposed findings; and

(iv) A rebuttal of the other party's request for review or other submissions already filed with the Administrator.

(2) These submissions shall be limited to issues the Administrator has decided to review and confined to the record of the Board hearing.

(3) A party or HCFA, within 15 days of receipt of a notice that the Administrator has decided to review a decision, may also request that the decision be remanded and state reasons for doing so. Reasons for a request to remand may include new, substantial evidence concerning—

(i) Issues presented to the Board; and

(ii) New issues that have arisen since the case was presented to the Board.

(4) A copy of any written submission made under this paragraph shall be sent simultaneously to each other party to the Board hearing and to HCFA, if HCFA has previously—

(i) Requested that the Administrator review a Board decision or filed a written submission in response to a party's request for review.

(ii) Responded to a party's request for review; or

(iii) Submitted material after the Administrator has announced that he or she will review a Board decision.

(f) *Ex parte communications prohibited.* All communications from any of the parties or HCFA about a Board decision being reviewed by the Administrator must be in writing and must contain a certification that copies have been served on the parties and HCFA, as appropriate. The Administrator will not consider any communication that does not meet these requirements or is not submitted within the required time limits.

(g) *Administrator's decision.* (1) If the Administrator has notified the parties and HCFA that he or she has decided to review a Board decision, the Administrator will affirm, reverse, modify or remand the case.

(2) The Administrator will make this decision within 60 days after the provider received notification of the Board decision and will promptly mail a copy of the decision to each party and to HCFA.

(3) Any decision other than to remand will be confined to—

(i) The record of the Board, as forwarded by the Board;

(ii) Any materials submitted under paragraphs (b) or (e) of this section; and

(iii) Generally known facts that are not subject to reasonable dispute.

(4) The Administrator may rely on prior decisions of the Board, the Administrator and the courts, and other applicable law, whether or not cited by the parties and HCFA.

(h) *Remand.* (1) A remand to the Board by the Administrator vacates the Board's decision.

(2) The Administrator may direct the Board to take further action with respect to the development of additional facts or new issues, or to consider the applicability of laws or regulations other than those considered by the Board. The following are not acceptable bases for remand—

(i) Presentation of evidence existing at the time of the Board hearing that was known or reasonably could have been known;

(ii) Introduction of a favorable court case that was either not available in print at the time of the Board hearing or was decided after the Board hearing;

(iii) Change of a party's representation before the Board;

(iv) Presentation of an alternative legal basis concerning an issue in dispute; or

(v) Attempted retraction of a waiver of a right made before or at the Board hearing.

(3) After remand, the Board will take the action requested in the remand action and issue a new decision.

(4) The new decision will be final unless the Administrator reverses, affirms, modifies, or again remands the decision in accordance with the provisions of the section.

[48 FR 45773, Oct. 7, 1983]

# THE SOCIAL SECURITY ACT AS AMENDED - TITLE XVIII

## Section 1878(f)(1) Judicial Review

(f)(1) A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision. Providers shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received. Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines (on its own motion or at the request of a provider of services as described in the following sentence) that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of such determination is received. If a provider of services may obtain a hearing under subsection (a) and has filed a request for such a hearing, such provider may file a request for a determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy (accompanied by such documents and materials as the Board shall require for purposes of rendering such determination). The Board shall render such determination in writing within thirty days after the Board receives the request and such accompanying documents and materials, and the determination shall be considered a final decision and not subject to review by the Secretary. If the Board fails to render such determination within such period, the provider may bring a civil action (within sixty days of the end of such period) with respect to the matter in controversy contained in such request for a hearing. Such action shall be brought in the district court of the United States for the judicial district in which the provider is located (or, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia and shall be tried pursuant to the applicable provisions under chapter 7 of title 5, United States Code, notwithstanding any other provisions in section 205. Any appeal to the Board or action for judicial review by providers which are under common ownership or control or which have obtained a hearing under subsection (b) must be brought by such providers as a group with respect to any matter involving an issue common to such providers.

**§ 405.1877   Judicial review.**

(a) *General rule.* Section 1878(f) of the Act permits a provider to obtain judicial review of a final decision of the Board, or of a reversal, affirmation, or modification by the Administrator of a Board decision, by filing a civil action pursuant to the Federal Rules of Civil Procedure within 60 days of the date on which the provider received notice of—

(1) A final decision by the Board; or

(2) Any reversal, affirmance, or modification by the Administrator.

The Board's decision is not final if the Administrator reverses, affirms or modifies the decision within 60 days of the date on which the provider received notice of the decision.

(b) *Administrator declines to review a Board decision.* If the Administrator declines to review a Board decision, the provider must file its appeal within 60 days of receipt of the decision of the Board.

(c) *Administrator does not act after reviewing a Board decision.* If the Administrator notifies the parties that he or she has decided to review a Board decision and then does not make a decision within the 60 days allotted for his or her review, this subsequent inaction constitutes an affirmance allowing a provider an additional 60 days in which to file for judicial review, beginning with the date the Administrator's time expires for taking action under § 405.1875(g)(2).

(d) *Matters not subject to judicial review.* Certain matters affecting payments to hospital under the prospective payment system are not subject to judicial review, as provided in section 1886(d)(7) of the Act and § 405.1804.

(e) *Group appeals.* Any action under this section by providers that are under common ownership or control (see § 413.17 of this chapter) must be brought by the providers as a group with respect to any matter involving an issue common to the providers.

(f) *Venue for appeals.* An action for judicial review must be brought in the District Court of the United States for the judicial district in which the provider is located (or, effective April 20, 1983, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia. Effective April 20, 1983, any action for judicial review by providers under common ownership or control (§ 413.17 of this chapter), must be brought by such providers as a group with respect to any matter involving an issue common to the providers.

(g) *Service of process.* Process must be served as described under 45 CFR part 4.

[48 FR 39836, Sept. 1, 1983, as amended at 48 FR 45774, Oct. 7, 1983; 51 FR 34793, Sept. 30, 1986]

(a)    General rule
Section 1878(f) of the Act permits a provider to obtain judicial review of a final decision of the Board, or of a reversal, affirmation, or modification by the Administrator of a Board decision, by filing a civil action pursuant to the Federal Rules of Civil Procedure within 60 days of the date on which the provider received notice of--
(1)    A final decision by the Board; or
(2)    Any reversal, affirmance, or modification by the Administrator.
The Board's decision is not final if the Administrator reverses, affirms or modifies the decision within 60 days of the date on which the provider received notice of the decision.

(b)    Administrator declines to review a Board decision
If the Administrator declines to review a Board decision, the provider must file its appeal within 60 days of receipt of the decision of the Board.

(c)    Administrator does not act after reviewing a Board decision
If the Administrator notifies the parties that he or she has decided to review a Board decision and then does not make a decision within the 60 days allotted for his or her review, this subsequent inaction constitutes an affirmance allowing a provider an additional 60 days in which to file for judicial review, beginning with the date the Administrator's time expires for taking action under Section 405.1875(g)(2).

(d)    Matters not subject to judicial review
Certain matters affecting payments to hospital under the prospective payment system are not subject to judicial review, as provided in Section 1886(d)(7) of the Act and Section 405.1804.

(e)    Group appeals
Any action under this section by providers that are under common ownership or control (see Section 405.427) must be brought by the providers as a group with respect to any matter involving an issue common to the providers.

(f)    Venue for appeals
An action for judicial review must be brought in the District Court of the United States for the judicial district in which the provider is located (or, effective April 20, 1983, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia. Effective April 20, 1983, any action for judicial review by providers under common ownership or control (Section 405.427), must be brought by such providers as a group with respect to any matter involving an issue common to the providers.

(g)    Service of process
Process must be served as described under 45 CFR Part 4.

(41 FR 52051, Nov. 26, 1976. Redesignated at 42 FR 52826, Sept. 30, 1977 amended at 48 FR 39836, Sept. 1, 1983; 48 FR 45774, Oct. 7, 1983)

# EXHIBIT B

Received 06/10/2008 02:27PM in 01:06 on line [0] for DP04924 * Pg 1/3
06/10/2008  13:57    4107860043                    CMS                                    PAGE  01

# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## CENTERS FOR MEDICARE & MEDICAID SERVICES
### OFFICE OF THE ATTORNEY ADVISOR

---

### FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Dan Peterson, Esquire | Jacqueline R. Vaughn<br>OAA |

| COMPANY: | DATE: |
|---|---|
| Fulbright & Jaworski LLP | 06/10/2008 |

| FAX NUMBER: | TOTAL NO. OF PAGES INCLUDING COVER: |
|---|---|
| 202-662-4643 | 3 |

| PHONE NUMBER: | SENDER'S PHONE NUMBER: |
|---|---|
| 202-662-0200 | 410-786-3176 |

RE:

---

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

---

NOTES/COMMENTS:

The information contained in this communication may be confidential, is intended only for the use of the recipient named above, and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender and delete the original message and any copy of it from your system. Thank you.

---

Received 06/10/2008 02:27PM in 01:06 on line [0] for DP04924 * Pg 2/3
06/10/2008  13:57    4107860043                    CMS                              PAGE  02

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



**CENTERS for MEDICARE & MEDICAID SERVICES**

### Office of the Attorney Advisor

---

JUN 1 0 2008

**VIA FACSIMILE AND
FIRST CLASS MAIL**

Dan M. Peterson, Esquire
Fulbright & Jaworski LLP
801 Pennsylvania Avenue, NW
Washington, DC 20004-2623

Re: <u>Summit Medical Center,</u> PRRB Decision No. 2008-D24

Dear Mr. Peterson:

This is to advise that the Administrator of the Centers for Medicare & Medicaid Services (CMS) has declined to review the decision entered by the Provider Reimbursement Review Board in the captioned case.

If the Provider wishes to obtain judicial review of the matter, civil action must be initiated within 60 days of the date the Board's decision was received in accordance with 42 CFR 405.1877.

Sincerely yours,

Jacqueline R. Vaughn
Attorney Advisor

Enclosure

cc:  Bernard M. Talbert, Esquire, Intermediary's Representative

Received 06/10/2008 02:27PM in 01:06 on line [0] for DP04924 * Pg 3/3
06/10/2008  13:57    4107860043                    CMS                              PAGE  03

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Phone 410-786-3176 Facsimile 410-786-0043



CENTERS for MEDICARE & MEDICAID SERVICES

Re: <u>Summit Medical Center</u>, PRRB No. 2008-D24 (04/15/2008)(FYEs 02/28/98 and
    02/28/99)


Pursuant to 42 C.F.R. § 405.1875(d)(2), I recommend that the Administrator, Centers for

Medicare and Medicaid Services, decline to review the decision entered by the Provider

Reimbursement Review Board in this case.




Jacqueline R. Vaughn
Attorney Advisor



APPROVED:


Date: 6/4/08

Herb B. Kuhn
Deputy Administrator
Centers for Medicare & Medicaid Services

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Alta Bates Summit Medical Center | Michael O. Leavitt, in his Official Capacity as Secretary, United States Department of Health and Human Services |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF          88888<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)<br>Dan M. Peterson<br>Fulbright & Jaworski, LLP<br>801 Pennsylvania Avenue, NW<br>Washington, DC 20004<br>(202) 662-0200 | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
◉ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ A. Antitrust

☐ 410 Antitrust

○ B. Personal Injury/ Malpractice

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

◉ C. Administrative Agency Review

☒ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original
Proceeding
○ 2 Removed
from State
Court
○ 3 Remanded from
Appellate Court
○ 4 Reinstated
or Reopened
○ 5 Transferred from
another district
(specify)
○ 6 Multi district
Litigation
○ 7 Appeal to
District Judge
from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Review of Provider Reimbursement Review Board decision applying an inflation adjusted 1984 base year TEFRA target rate under 42 U.S.C. 1395ww.

**VII. REQUESTED IN
COMPLAINT**
☐ CHECK IF THIS IS A CLASS
ACTION UNDER F.R.C.P. 23
DEMAND $ recalculated reimbursement
JURY DEMAND:
Check YES only if demanded in complaint
YES ☐   NO ☒

**VIII. RELATED CASE(S)
IF ANY**
(See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE **June 13, 2008**   SIGNATURE OF ATTORNEY OF RECORD   _[signature]_

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.